UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| ASSUREDPARTNERS, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) Case No. 4:24-cv-01711 SEP |
| | ) |
| EDGEWOOD PARTNERS INSURANCE | ) |
| CENTER, INC., *dba* EPIC INSURANCE | ) |
| BROKERS & CONSULTANTS, et al., | ) |
| | ) |
| Defendants. | ) |

## **MEMORANDUM AND ORDER**

Before the Court is Plaintiff's Motion for Temporary Restraining Order, Doc. [35]. The Court held a hearing on the motion on March 7, 2025. For the reasons set forth below, the motion is denied.

### **BACKGROUND**[1]

Plaintiff initiated this breach of contract and trade secret action by filing an unverified Complaint on December 20, 2024. *See* Doc. [1]. Plaintiff's Complaint alleges six counts: (1) breach of contract, (2) tortious interference with contractual and prospective contractual relations, (3) misappropriation of trade secrets in violation of Missouri law, (4) violation of the Defend Trade Secrets Act, (5) unjust enrichment, and (6) breach of the duty of loyalty. *Id*.

On February 24, 2025, Plaintiff filed the instant motion for a temporary restraining order. Doc. [35]. The following facts are taken from the declaration of Tabbatha Sipes, the Area President of AssuredPartners of Missouri, Doc. [36-1]; the declaration of Joe Hennessey, a current employee of Plaintiff, Doc. [36-2], and the exhibits thereto; Plaintiff's memorandum in support of the motion, Doc. [41]; Defendants' memorandum in opposition to the motion, Doc. [44]; the declarations of Rick Frechmann, Joleen Mayfield, and Brad Snitzer (collectively, the Individual Defendants), Docs. [44-1]-[44-3]; and the declarations of EPIC employees Crawford McInniss, Doc. [44-4], and Jeremiah Glassford, Doc. [44-5].

---

[1] Nothing stated herein is binding at a trial on the merits. *Henderson v. Bodine Aluminum, Inc.*, 70 F.3d 958, 962 (8th Cir. 1995) (citation omitted).

Individual Defendants Rick Frechmann, Joleen Mayfield, and Brad Snitzer were producers[2] in AP's St. Louis office. Doc. [36-1] ¶ 2. During their employment with AP, they signed Restrictive Covenant Agreements, in which they promised to comply with certain restrictions related to the retention, use, and disclosure of AP's Confidential Information, and to return such information upon separation from employment with AP. Doc. [41] at 9. The RCAs also prohibit them, during their employment and for a period of two years following their employment, from soliciting, servicing, or interfering with any of AP's Restricted Clients. *Id*.

AP, in its memorandum in support of its motion for TRO, describes the following provisions[3] regarding non-solicitation and confidential information:

> **4. Non-Solicitation and Non-Interference.**
>
> a. During Employee's employment with the Company, Employee shall not induce or attempt to induce, or refer to a third party [for] the purpose of such third party inducing or attempting to induce, any person or entity to purchase an Insurance Product . . . from any person or entity other than a member of the Employer Group. Furthermore, during the twenty-four (24) month period immediately following the Separation Date (the "Restricted Period"), Employee shall not directly or indirectly through another person or entity (each a "Restricted Activity"):
>
>     i. Offer, sell, solicit, quote, place, provide, renew, or service any insurance product or service to, for, or on behalf of any Restricted Client;
>
>     ii. Take any action intended, or reasonably likely, to cause any Restricted Client, or any vendor, insurance carrier, wholesale broker, other client of the Employer Group, or any other third party that, in each case, Employee knows or has reason to know has a material business relationship with the Employee Group, to diminish its business with, or cease or refrain from doing business with, the Employer Group.

*Id*. at 10 (alteration by Court).

---

[2] A "producer" is another term for broker and is someone who represents individuals or entities that purchase insurance products.

[3] Plaintiff states that the quoted language is taken from Snitzer's Agreement, which differs from the Agreement signed by the other two Individual Defendants. *See* Doc. [41] at 10. Plaintiff asserts that the language quoted in its memorandum in support of the motion is "more precise" than the other two Agreements, but is the same in "meaning and scope" as the language in the earlier Agreements signed by Mayfield and Frechmann. *Id*. The Court notes that upon review of the older Agreements, relevant clauses in the Mayfield and Frechmann Agreements appear to differ from the Snitzer Agreement in significant respects, but because those differences are not germane to the Court's analysis in this Order, it will not explore those differences at this time.

> ****
>
> **3. Confidential Information.**
>
> 3.1  For purposes of this Agreement, the term Confidential Information means all confidential, proprietary and/or non-public information, whether or not in a written or recorded form, concerning the business or affairs of the Company, including but not limited to, information concerning:
>
> 3.1.1  The Company's clients, prospective clients, acquisition targets, vendors, insurance carriers, policy forms, rating information, expiration dates, and/or contracts or arrangements (including special terms and deals);
>
> 3.1.2 The Company's financial condition, results of operations, marketing plans, business plans, operations, pricing, promotions, and business strategies and methods; and
>
> 3.1.3 The services and products offered by the Company to its clients or prospective clients, including, but not limited to, policy forms, rating information, expiration dates, information on risk characteristics, and information concerning insurance markets for large or unusual risks.
>
> 3.2 Employee acknowledges and agrees that all Confidential Information is the sole and exclusive property of the Company. Accordingly, both during and after employment with the Company . . . Employee shall not use, or disclose to any third party, any Confidential Information for any reason other than as intended within the scope of Employee's employment or as approved by an executive officer of the Company in writing.  Upon separation of employment . . . Employee shall immediately deliver to Employer all documents, materials, and data (and copies thereof), in tangible, electronic, or intangible form, relating to the business of the Company.

*Id*. at 9.

> *****
>
> **(b)    Restricted Clients.**  For purposes of this Agreement, "Restricted Client" means the following:
>
> (i)    any client of the Employer Group during the two (2) years immediately preceding the Separation Date:  (A) as to which Employee received commission compensation and/or fees; (B) for which Employee had material involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any insurance product or service offered by any person or entity within the Employer Group (each an "Insurance Product"); or (C) about whom Employee received Confidential Information; or
>
> (ii)    any prospective client of the Employer Group during the two (2) years immediately preceding the Separation Date:  (A) for which

3

> Employee had material involvement in proposing, selling, quoting, placing, providing, servicing, or renewing any Insurance Product, or (B) about whom Employee received Confidential Information.

*Id.* at 10.

The Individual Defendants entered into the Agreements in exchange for significant compensation. Doc. [36-1] ¶ 2. In 2024, the last full year they were employed by AP, Frechmann was paid more than $400,000 in compensation, Mayfield over $230,000, and Snitzer over $370,000. *Id.*

On November 11, 2024, Sipes learned the Individual Defendants were discussing resigning from AP and joining a competitor, Defendant EPIC, in December 2024. *Id.* ¶ 3. At that time, Sipes also learned that Hennessey had been considering leaving Plaintiff for EPIC but had decided to remain in his position at AP. *Id.* On November 14, 2024, AP summoned Frechmann, Mayfield, and Snitzer to a conference room and informed them that their employment was suspended immediately pending further investigation. *Id.* ¶ 4. On that day, AP disabled their access to its systems, including email, and removed their name plates from their offices. Doc. [44-1] ¶¶ 33-34. During the investigation, AP found that between May 1, 2024, and November 12, 2024, Mayfield printed approximately 10,846 pages of information from AP's systems, including information about client accounts and lists of clients and prospective clients. Doc. [36-1] ¶ 4. On November 26, 2024, AP terminated the Individual Defendants. *Id.* ¶ 6.

After learning that the Individual Defendants might join EPIC, AP communicated with EPIC to let them know that the Individual Defendants had various contractual obligations to AP pursuant to their employment agreements, and on November 15, 2024, EPIC assured AP that EPIC would not permit the Individual Defendants to solicit or service clients in a way that violated their agreements with AP. *Id.* ¶ 7.

On December 2, 2024, the Individual Defendants began their employment with EPIC. *Id.* ¶ 8. At that time, EPIC "informed AP that the Individual Defendants would be returning any AP information they had remaining in their possession to [AP] directly." *Id.* (Ex. C to Sipes Declaration) (In an email from EPIC's Associate General Counsel, Jeremiah Glassford, to Anna Ketcham, the Associate General Counsel at AP, Glassford stated, "following AssuredPartners' termination of Rick Frechmann, Joleen Mayfield, and Brad Snitzer . . . they are each coordinating directly with their former manager to return documents and property."). According to Sipes, between December 2 and 6, 2024, Snitzer, Mayfield, and Frechmann returned AP-

4

related documents and materials that had been in their possession.  *Id*. ¶ 8.  Frechmann, Mayfield, and Snitzer each attest that they have returned all AP documents in their possession and did not make any copies of AP materials.  Docs. [44-1] ¶¶ 37-39, [44-2] ¶¶ 39-42, [44-3] ¶¶ 16-19.

On December 17, 2024, Ernst Radiology, one of AP's clients that had been serviced by Frechmann, notified AP that it would be using EPIC as its malpractice insurance broker.  Doc. [36-1] ¶ 9.  On January 1, 2025, AP received a Broker of Record (BOR) letter from the wholesaler of the Ernst policy confirming that EPIC would be handling the Ernst policy.  *Id*.  On December 17, 2024, AP reached out to EPIC to inquire about the move by Ernst.  *Id*. ¶ 9.  In response, Glassford wrote Ketcham, stating that he had investigated the matter and learned that "after Ernst Radiology learned that Rick [Frechmann] was no longer employed by AssuredPartners and that he could not be involved in servicing Ernst Radiology's accounts during the period of restriction in his covenants, Ernst Radiology contacted EPIC directly to request more information about the company, after which the insured informed EPIC that it had decided to appoint EPIC as it broker of record," and that "[n]either Rick, Joleen, nor Brad were involved in EPIC's discussions with Ernst." *Id*. (Ex. C).  Glassford went on to state that "EPIC's view is that so long as [Rick, Joleen, and Brad] do not solicit their former clients or participate in the acceptance or servicing of any of those clients' accounts during the restricted period, those clients are free to contact EPIC and to appoint EPIC as their broker."  *Id*.

On January 2, 2024, AP received a BOR indicating that Lander Binding and Finishing, an AP client who had been serviced by Snitzer, was switching its brokerage business to EPIC agent Pat O'Brien in EPIC's Indianapolis office.  *Id*. ¶ 11.  Snitzer is a close friend of Lander's manager.  *Id*.  This BOR included the following language: ". . . by signing below, we confirm that our decision was made without inducement, suggestion, persuasion or solicitation by any individual or entity and, instead, expresses our independent selection of our preferred insurance broker" (hereinafter the Non-Inducement Clause).  *Id*. ¶ 12.

On January 9, 2025, AP received a third BOR indicating that an AP client, APX, was moving to EPIC.  Doc. [36-1] ¶ 13.  This BOR also indicated that an Indianapolis EPIC agent would be handling APX's account with EPIC and included the Non-Inducement Clause.  *Id*.  On January 24, 2025, AP received notice that another client, Troy Dinkel, had signed a BOR moving his brokerage from AP to EPIC, though AP "was not provided a copy of the BOR letter."  *Id*.

5

¶ 14.  On February 11, 2025, AP was notified that its client, Delmar Financial, which had been serviced by Snitzer while at AP, was moving its business to EPIC.  *Id*. ¶ 15.  AP has not received a BOR confirming the loss of Delmar Financial.  *Id*.  On February 13, 2025, AP received BOR notices concerning J&S Industrial moving to EPIC.  *Id*. ¶ 17.  All the BORs indicated they would be serviced by an Indianapolis EPIC broker, and all contained the Non-Inducement Clause.  *Id*.  J&S had been serviced by Frechmann while he was at AP.  *Id*. ¶ 16.

After receiving the J&S BORs, Sipes looked at Mayfield's print logs again and found that a spreadsheet she had printed included policy information for Ernst, APX, and J&S.  *Id*. ¶ 18.  Sipes noted that Mayfield printed documents containing Ernst's strategic plans, loss runs, and coverage proposals.  *Id*. ¶ 19.  Sipes avers that when she went through the box of material returned to AP by Mayfield she found an "Expiration List" showing the date on which each AP policy assigned to Mayfield would expire, the estimated premium and commission amounts for each, and the affiliated policy number and carrier.  *Id*. ¶ 20.

Mayfield attests that she had a habit of printing "voluminous records" of her work product and documents throughout her entire nine years of employment with AP.  Doc. [44-2] ¶¶ 25-31.  She attests that while at AP, she, like all producers at the company, was responsible for tracking her earned commissions for each account and monitoring the timing for renewals on accounts.  *Id*. ¶ 29.  Because of this, she claims, each month she printed all relevant records necessary to manage accounts and track commissions and renewals.  *Id*. ¶ 30.  She attests that she printed material related to Ernst Radiology in August 2024 because the policy renewal date for that account was in September 2024, and Mayfield was assigned to prepare the renewal because the producer assigned to the Ernst account was on vacation.  *Id*. ¶ 35.  She also attests that she, Frechmann, and Hennessey often met on a weekly basis to discuss client needs, and that in preparation for those meetings she would customarily print lists of current and prospective clients and relevant information about their accounts.  *Id*. ¶¶ 29-31.  And she claims that her practice of printing work materials continues at EPIC, where she likewise prints large amounts of documentation.  *Id*. ¶ 28.

Finally, on February 14, 2025, an AP producer, Nick Rallo, checked in with an alleged prospective client, Kolb Group, to discuss their insurance needs, and Kolb responded that they were working with other consultants, including Individual Defendants Frechmann and Mayfield.  *Id*. ¶ 21.  Sipes avers that Kolb is an account that several AP employees, including Frechmann

6

and Mayfield (while still with AP), were "making material and consistent efforts to solicit." *Id*. On February 19, 2025, an employee at Kolb mistakenly copied Frechmann's old AP email address on a communication between him, Frechmann, and Mayfield. *Id*. ¶ 22. The email thread shows that Mayfield emailed the Kolb contact, providing him with documents to discuss on a scheduled phone call. *Id*.

Frechmann, in his declaration, states that information about his move to EPIC was posted on LinkedIn and included in the St. Louis Business Journal. Doc [44-1] ¶¶ 40, 48. Frechmann has for years been "close friends" with Bruce Kypta, who owns J&S and APX. *Id*. ¶ 45. Frechmann attests that Kypta noticed on LinkedIn that Frechmann had moved to EPIC and when he reached out to Frechmann to ask about EPIC Frechmann informed him that if he wanted more information about EPIC he would have to speak to someone else, and told him he could reach out to Crawford McInnis at EPIC if he wished. *Id*. ¶ 46. Frechmann also attests that around Christmas of 2024, Troy Dinkel, after noticing one of the public announcements about Frechmann's move to EPIC, texted him and asked if he could move to EPIC. *Id*. ¶ 48. Frechmann told Dinkel that he could not service him at EPIC due to the RCA, but that he could reach out to Chris Novotney, the EPIC producer who services personal insurance lines. *Id*. ¶ 49. Frechmann attests that he has not spoken to any AP clients about his employment with EPIC other than in response to them reaching out to him. *Id*. ¶ 50.

Similarly, Snitzer attests that he has not engaged in solicitation of any AP clients that he serviced while with the company. Doc. [44-3] ¶ 21. He further attests that he and his wife have been good friends with Todd Solomon, the co-owner of Delmar Financial, for over 25 years. *Id*. ¶ 23. When Solomon heard that Snitzer had left AP, he contacted Snitzer to ask where he went, and Snitzer responded that he worked at EPIC now, but that he was unable to give him more information and if he wanted to learn more about EPIC he could reach out to Dan Grelecki, who handles employee benefit policies for the company. *Id*. ¶ 24. He further attests that he has been close friends with Steven Lander, owner of Lander Bookbinding Corp., and his wife for over 20 years. *Id*. ¶ 25. After Lander saw on LinkedIn that Snitzer moved to EPIC, he asked Snitzer about the company, and Snitzer told Lander that he would have to reach out to Crawford McInnis if he wished to hear more about EPIC. *Id*. ¶ 26.

Mayfield attests that she has not made any efforts to solicit any AP clients that she previously serviced while at AP. Doc. [44-2] ¶ 44. She also attests that a friend of hers who is

7

the executive director of a current AP client approached her about moving her business to EPIC after learning that Mayfield had left AP, and Mayfield advised her that she should stay with AP because it was better suited to meet her particular needs. *Id.* ¶ 45. She also claims to have no incentive to solicit AP clients in violation of the RCA, as her employment agreement with EPIC would be subject to termination if she breached her RCA with AP. *Id.* ¶ 50.

When AP filed the instant motion, the Court set a briefing schedule and held a motion hearing on March 7, 2025, after which it took the parties' arguments under advisement. This Memorandum and Order follows.

## LEGAL STANDARD

"A temporary restraining order is an extraordinary and drastic remedy." *King v. Blake*, 2009 WL 73678, at *1 (E.D. Mo. Jan. 9, 2009). When considering whether to issue injunctive relief, the Court evaluates: (1) the threat of irreparable harm to the movant; (2) the balance between this harm and the injury that granting the injunction will inflict on other parties; (3) the probability that movant will succeed on the merits; and (4) the public interest. *See Cigna Corp. v. Bricker*, 103 F.4th 1336, 1342 (8th Cir. 2024) (citing *Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109 (8th Cir. 1981) (en banc). The inquiry is "whether the balance of equities so favors the movant that justice requires the court to intervene to preserve the status quo until the merits are determined." *Dataphase*, 640 F.2d at 113.

"While 'no single factor is determinative,' the probability of success factor is the most significant." *Home Instead, Inc. v. Florance*, 721 F.3d 494, 497 (8th Cir. 2013) (quoting *Dataphase*, 640 F.2d at 113) (internal citation omitted). This factor directs courts to ask whether the party requesting a preliminary injunction has a "fair chance of prevailing." *Planned Parenthood Minn., N. Dak., S. Dak. v. Rounds*, 530 F.3d 724, 732 (8th Cir. 2008) (en banc). Additionally, a plaintiff "need only establish a likelihood of succeeding on the merits of any one of [its] claims." *Richland/Wilkin Joint Powers Auth. v. Army Corps of Eng'rs*, 826 F.3d 1030, 1040 (8th Cir. 2016) (citing *Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F.Supp.2d 230, 250 (D.D.C. 2003)). Even when a plaintiff has a strong claim on the merits, however, "[f]ailure to demonstrate irreparable harm is a sufficient ground to deny a preliminary injunction." *Phyllis Schlafly Rev. Trust v. Cori*, 924 F.3d 1004, 1009 (8th Cir. 2019) (quoted case omitted). The moving party bears the burden to establish the need for injunctive relief. *See Chlorine Institute, Inc. v. Soo Line R. R.*, 792 F.3d 903, 914 (8th Cir. 2015).

## DISCUSSION

**I.     AP has not demonstrated irreparable harm.**

"The threshold inquiry" when considering a motion for injunctive relief "is whether the movant has shown the threat of irreparable injury," *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987), so the Court begins its assessment there. Without such a showing, Plaintiff cannot demonstrate that it is entitled to equitable relief. *See CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 402 (8th Cir. 2009) ("While the absence of a likelihood of success on the merits strongly suggests that preliminary injunctive relief should be denied, a finding of a likelihood of success on the merits only justifies preliminary relief if there is a risk of irreparable harm . . . ."). The threatened harm must be "certain and great and of such imminence that there is a clear and present need for equitable relief," *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013), and the absence of a substantial likelihood of irreparable injury, standing alone, makes preliminary injunctive relief improper. *See Adventist Health Sys./SunBelt, Inc. v. U.S. Dep't of Health & Human Servs.*, 17 F.4th 793, 801, 806 (8th Cir. 2021) ("The failure to show irreparable harm is an independently sufficient basis upon which to deny a preliminary injunction.") (internal quotation marks omitted). Here, because Plaintiff has failed to demonstrate irreparable harm, its motion for TRO is denied.

A movant establishes irreparable harm only if monetary damages cannot provide adequate compensation for a defendant's improper conduct. *See Phyllis Schlafly Revocable Tr.*, 924 F.3d at 1009; *Gen. Motors Corp. v. Harry Brown's, LLC*, 563 F.3d 312, 319 (8th Cir. 2009) ("Irreparable harm occurs when a party has no adequate remedy at law, typically because its injuries cannot be fully compensated through an award of damages."); *Iowa Utilities Bd. v. F.C.C.*, 109 F.3d 418, 425 (8th Cir. 1996) (same). And typically, "economic loss does not, in and of itself, constitute irreparable harm" to a party unless "the loss threatens the very existence of the [party's] business." *Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986).

Plaintiff AP does not argue that it is at risk of going out of business due to Defendants' alleged misconduct. Rather, it claims to have lost "6 clients, 21 insurance policies, and over 6 figures in revenue." Doc. [41] at 1.[4] Plaintiff asserts that the movement of clients to EPIC is causing "incalculable" losses to its reputation and goodwill. *Id*. at 34. Because it can be difficult

---

[4] Plaintiff's counsel also claimed at the March 7, 2025, hearing that two more AP clients had moved to EPIC since its last filing.

to quantify, the "[l]oss of intangible assets such as reputation and goodwill *can* constitute irreparable injury." *United Healthcare Ins. Co. v. AdvancePCS*, 316 F.3d 737, 741 (8th Cir. 2002) (emphasis added) (citing *Gen. Mills, Inc. v. Kellogg Co.*, 824 F.2d 622, 625 (8th Cir. 1987)). But "loss of customers or customer goodwill does not give rise to a presumption of irreparable harm." *Novus Franchising, Inc. v. Dawson*, 725 F.3d 885, 895 (8th Cir. 2013) ("[W]e question whether [the] alleged injuries, *i.e.*, a loss of customers or customer goodwill, are truly irreparable in the sense that they could not be addressed through money damages . . . .") (citing *Gen. Motors Corp. v. Harry Brown's, L.L.C.*, 563 F.3d 312, 319 (8th Cir. 2009)) (district court did not clearly err in finding harm from "lost customer relationships was equivalent to a claim of lost profits").

Harm suffered from lost customers can be measured by the lost profits from the business of those customers and, "[b]y definition, lost profits are 'reparable' through money damages." *Wells Fargo Ins. Servs. USA, Inc. v. King*, 2016 WL 299013, at *8 (D. Minn. Jan. 25, 2016) (denying injunctive relief where former employee "stole" clients away from plaintiff in violation of noncompete agreement because such harm was nonetheless reparable through money damages); *accord CDI Energy Servs. v. W. River Pumps, Inc.*, 567 F.3d 398, 403 (8th Cir. 2009) (harm resulting from loss of customers could be remedied through damages). This case is, at its core, about money—"[n]o historic building is going to be destroyed. No toxins are going to be released into the environment. No ship is going to leave port, never to return." *Wells Fargo*, 2016 WL 299013, at *8. Plaintiff alleges that Defendants are stealing clients away in violation of their RCAs, and the primary harm alleged is the lost profits those clients might generate.

To warrant extraordinary injunctive relief, Plaintiff must explain *how* Defendants' alleged actions are likely to cause irreparable harm to its reputation or goodwill, and not just monetary harm. *See Chlorine Institute, Inc.,* 792 F.3d at 914 (moving party bears the burden to establish the need for injunctive relief). Plaintiff has presented the Court with nothing more than speculative and conclusory allegations to that effect. Plaintiff merely asserts that "each client (both prospective and existing) that the Individual Defendants contact, solicit, service, interfere with, or refer to some out-of-state EPIC producer will represent substantial losses to AP that are incalculable, including the irreparable harm AP will suffer as to client relationships, reputation, and attendant goodwill." Doc. [41] at 34. But it does not provide facts supporting its generalized claims of harm. And the mere risk of "harm to customer goodwill" stated in

10

"general, 'conclusory terms'" does "not show a likelihood of irreparable harm that, in turn, would justify issuing a preliminary injunction." *Midwest Sign & Screen Printing Supply Co. v. Dalpe*, 386 F. Supp. 3d 1037, 1055–56 (D. Minn. 2019) (quoting *Mgmt Registry, Inc. v. A.W. Cos.*, 2018 WL 461132, at *6 (D. Minn. Jan. 16, 2018), *aff'd,* 920 F.3d 1181 (8th Cir. 2019)).

While in some instances lost customers could constitute irreparable harm to reputation and goodwill, Plaintiff has not shown how that is the case here. The Court will not presume that a handful of clients moving to a competitor will result in irreparable harm to AP's goodwill and reputation without a more adequate basis for so concluding. *See S.J.W. ex rel Wilson v. Lee's Summit R–7 Sch. Dist.,* 696 F.3d 771, 779 (8th Cir. 2012) ("Speculative harm does not support a preliminary injunction.").

Plaintiff also asserts that that it expects more of the same harm, *i.e.*, lost customers and lost profits, if Defendants are not enjoined. *Id*. at 34; Doc. [1] at 3 (AP "expects a cascade" of existing clients will move to EPIC). And it claims its harms will be too difficult to quantify. The Court finds neither of those arguments persuasive. First, at this stage, it appears that most, if not all, of the AP clients who have transferred their business to EPIC have had longstanding pre-existing personal relationships with at least one of the Individual Defendants—a situation unlikely to be replicated with respect to many other clients. But if AP's predictions were to come to pass, the resulting damages would be similarly monetary in nature, and thus, calculable. At oral argument, AP provided the Court with a precise number of potentially affected existing and prospective AP clients. Given a finite set of clients and the finite duration of the non-solicitation provision, the amount of revenue lost as a result of improper solicitation does not, at this early juncture, seem likely to be an especially challenging calculation. And in any case, such difficulty has not prevented other courts from concluding that similar harms are compensable. *See, e.g.*, *Guy Carpenter & Co. v. John B. Collins Assocs., Inc.,* 179 F. App'x 982, 983 (8th Cir. 2006) ("We agree with the district court that damages are an adequate remedy for any breach because clients who leave Carpenter can be identified and the damages resulting from the loss of those clients can be calculated.") (internal citations omitted); *Allied Services, LLC v. Smash My Trash, LLC*, 2021 WL 1671675, at *4 (W.D. Mo. Apr. 28, 2021) (Plaintiff's stated harms are not "truly irreparable," because "although Plaintiff claims Smash's actions have prompted some customers to cancel or amend their contracts with Plaintiff, Plaintiff fails to demonstrate that this loss of business threatens its existence or is unrecoverable . . . Plaintiff's

11

alleged harms are, in essence, a claim for lost profits, an injury that is quantifiable as well as compensable via an award of monetary damages.").

The Court, at this point, sees no reason AP would be unable to identify which clients follow the Individual Defendants to EPIC and calculate with reasonable certainty its resulting lost profits. *See* Doc. [41] at 1 (Plaintiff states that it has lost "6 clients, 21 insurance policies, and over 6 figures in revenue" because of Defendants' alleged actions.). Therefore, the Court cannot say that there is no adequate remedy at law.

### II.     The Court need not address the remaining *Dataphase* factors.

AP's failure to show irreparable harm is, by itself, a sufficient basis to deny the requested injunctive relief. *Gelco Corp. v. Coniston Partners*, 811 F.2d 414, 418 (8th Cir. 1987). Because AP has failed to demonstrate irreparable harm, the Court declines to address the remaining *Dataphase* factors. *See, e.g.*, *Medtronic, Inc. v. Ernst*, 182 F. Supp. 3d 925, 934-35 (D. Minn. 2016) (denying motion for temporary restraining order based solely on plaintiff's failure to demonstrate irreparable harm).

Accordingly,

**IT IS HEREBY ORDERED** that Plaintiff's Motion for Temporary Restraining Order, Doc. [35], is **DENIED.**

**IT IS FURTHER ORDERED** that the parties will meet and confer and file on the docket **no later than Friday, March 14, 2025**, a proposed schedule for limited discovery and briefing of a motion for a preliminary injunction. The proposed schedule should include the earliest date by which the parties would be prepared for a hearing on preliminary injunction.

Dated this 10th day of March, 2025.

_____
SARAH E. PITLYK
UNITED STATES DISTRICT JUDGE